## THE S. S. SERPA PINTO.

### No. 16216.

District Court, E. D. New York.
May 29, 1942.

Sherman & Goldring, of New York City (Jacquin Frank, of New York City, of counsel), for libelant.

Burlingham, Veeder, Clark & Hupper, of New York City (C. B. M. O'Kelley, of New York City, of counsel), for claimant.

BYERS, District Judge.

The libelant, a third class passenger on the S. S. Serpa Pinto bound from Lisbon to

New York, was injured on January 5, 1941, as the result of being struck by a wave which boarded the C deck at the round of the stern on the starboard side.

The sole basis of his claim of negligence is thus stated in his proctor's brief: "The ship was at fault in failing to either rope off all exposed decks under the weather conditions prevailing, or warning passengers to keep off them."

There was no such warning, and the only roping off was on the life-boat deck, to prevent passengers from falling between the life-boats, and on the promenade and C decks, forward of the bridge.

The facts are not substantially in dispute, and may be tabulated as follows:

1. The Serpa Pinto is a twin-screw steamship of Portuguese registry, of 8480 gross tonnage, 450¼ feet long, 58⅔ feet in beam, and 30½ feet in depth.

2. She sailed from Lisbon for New York on December 28, 1940, with a full complement of officers and crew, and was in all respects seaworthy, and carried passengers as permitted by law.

3. The voyage proceeded without incident and without stress of seas or weather, until the afternoon of January 4, 1941.

4. The ship had five decks, lettered from the lowest to the highest as A to E, inclusive; C deck was the main deck and was open fore and aft, and the midship section contained cabins and other passenger accommodations. The aft portion of the main deck contained the smoking room and bar, and other housing, which did not extend the full width of the ship; the open space was available for deck use by the passengers including those traveling third class.

5. At 12 o'clock noon on January 5, 1941, the position of the ship, according to her log, was latitude 37° 2′ north and longitude 58° 36′ west.

6. The ordinary speed of the vessel under normal sea conditions was 13.6 knots, and at the time of the libelant's injury the ship's course was 282° true and 306° by compass, or between west and west-northwest.

7. The weather conditions on January 4, 1941, from noon until 4 o'clock according to the log were as follows: "Heavy seas. Fresh breeze. Bad weather."

From 4 to 8: "Strong breeze, heavy seas, and normal visibility."

From 8 to 12 midnight: "Strong breeze, squalls, heavy seas, overcast sky."

No seas were shipped and the wind was west.

On January 5th, from midnight to 4 a. m.: "Fresh breeze, heavy seas, good visibility, clear sky. Bad weather but improving gradually toward the end of the watch."

From 4 to 8 a. m.: "Continued strong breeze and heavy seas, the vessel sometimes shipping water."

From 8 a. m. to 12 noon: "Strong breeze, very heavy seas, subjecting the steamer to heavy impacts of the waves."

From 12 noon to 4 p. m.: "At 12 o'clock noon, the steamer hove to, due to bad weather. Strong breeze, cloudy sky, visibility normal. There were some squalls."

From 4 to 8 p. m.: "Fresh gale, heavy seas, frequently shipping water over forecastle, and cloudy sky, squalls."

From 8 p. m. to 12 midnight: "Fresh gale, heavy seas, frequently shipping water, sky overcast, heavy squalls."

Seas were shipped on the forecastle, and the wind direction veered from west-southwest to west and west-northwest and finally west; it was in the west at 8 a. m. of January 5th and so held until noon, after which it shifted to west-northwest.

At 8 a. m. the wind blew at force 6 (27 land miles) and at noon it was at force 7 (35 land miles per hour).

8. The vessel was heading into the wind from about midnight of January 4th until noon and after of January 5th.

9. At midnight of January 4th speed was reduced to 11 knots and at 4 a. m. January 5th it was again reduced, to 9 knots, and at noon to 5½ knots.

10. From midnight of January 4th through noon of January 5th, the ship was pitching but not rolling, and the master was on the bridge throughout that time because of the bad weather conditions prevailing.

11. The forward part of the main deck C, ordinarily used by third class passengers, was roped off so as to exclude its use by passengers on the day before and on the day of the libelant's accident.

12. On January 5, 1941, the libelant left his cabin on deck B, where he had been writing, came up the interior companionway to deck C, and made his way aft to the open space on that deck, and entered the smoking room at about 11 a. m., using a doorway in the forward bulkhead of that housing; he remained there only a short interval, and re-

turned to the open deck, and crossed to the starboard side and walked aft to a position at the stern on the starboard side, directly outside of housing at that place, and stood in that position for ten or fifteen minutes with a companion, talking and watching the waves; there were ten or a dozen other passengers in the immediate vicinity, similarly engaged.

13. The libelant was standing with his back to the said housing, facing generally the starboard side of the vessel, when a wave came over the stern, struck him, and carried him forward some 10 or 15 feet, throwing him against some bitts or stanchions, at about 11:30 a. m., with the result that he suffered a fracture of the left hip, namely, the injury for which he seeks recovery in this proceeding.

14. The wave which caused the libelant's injury was the only one that boarded the vessel at the stern on the day in question.

15. The direction of the said wave, as it struck the ship, was almost directly against the prevailing westerly wind.

16. During the pitching of the ship which had prevailed from midnight of January 4th to the time of the accident, as the ship's stern came down in the seas, spray splashed over the stern, causing the deck at the place where the accident occurred to be wet, but that condition did not result from waves coming aboard.

17. The libelant was an experienced ocean traveler, having made two trans-Atlantic trips and several on the Mediterranean and the Baltic seas, and had sailed in all weathers; he was a member of the Air Corps in the French Army in 1940 and, while not a pilot, had seen service in the air.

18. As the libelant made his way aft toward the smoking room along the enclosed portion of the main deck, he observed the spray coming over the starboard side of the ship and falling upon the open deck where he was later injured; and when he took up his position above-stated and maintained it for fifteen minutes, he had a sufficient opportunity to observe the action of the ship and of the seas in which she was traveling, and there was nothing to prevent his seeking shelter, if he deemed the position which he assumed to be one of peril.

19. There was no requirement on January 4th or 5th that this portion of the deck should be roped off, or that passengers should be notified that, if they chose to stand there, they might find the footing precarious, or a position of stability difficult to maintain.

20. The condition sometimes described as that of a confused sea did not obtain between the hours of 8 a. m. and 12 o'clock noon on January 5th, and the wave which caused the libelant's injury was unexpected in direction and force.

21. It was not negligence on the part of the ship or her master and his subordinates to fail to rope off this portion of the deck; nor were the expectable conditions there so hazardous that the passengers should have been warned of danger likely to be encountered by making customary use of that portion of the deck.

Conclusion.

The libel must be dismissed, with costs. Settle decree.